**STAR–GLO ASSOCIATES, LP, and Ruby Red Equities, LP, Plaintiffs,**

v.

**UNITED STATES, Defendant.**

No. 03–1239C.

United States Court of Federal Claims.

March 3, 2004.

---

26. Neuberger Dep. Ex. 6.

Les Alderman, Alderman & Devorsetz, PLLC, Washington, D.C., for the plaintiffs. Mark Niles and T. Cary Devorsetz, Alderman & Devorsetz, PLLC, of counsel.

Michael O'Connell, Trial Attorney; David M. Cohen, Director, Commercial Litigation Branch, Civil Division; Peter D. Keisler, Assistant Attorney General, United States Department of Justice, for the defendant. Carlynee S. Cockrum, Office of General Counsel, United States Department of Agriculture, of counsel.

## OPINION

HORN, Judge.

## FINDINGS OF FACT

Plaintiffs, Star–Glo Associates (Star–Glo) and Ruby Red Equities (Ruby Red), own citrus groves in Florida. Citrus canker is a plant disease that can cause damage to plants resulting in unmarketable fruit. There has been an outbreak of citrus canker in Florida since about 1995.

In 1995, the Florida Department of Agriculture and Consumer Services (FDACS) implemented an eradication plan to prevent the spread of citrus canker within the State. The plan included identifying and removing citrus trees infected or exposed to citrus canker. Public Law No. 106–387 provides that the United States Department of Agriculture (USDA) "pay Florida commercial citrus and lime growers $26 for each commercial citrus or lime tree removed to control citrus canker." Making Appropriations for Agriculture, Rural Development, Food and Drug Administration, and Related Agencies for Fiscal Year 2001, Pub.L. No. 106–387, § 810(a), 114 Stat. 1549, 1549A–52 (2000) (hereinafter section 810). The statute places various caps on the number of trees per acre for which the USDA will provide compensation:

> Payments under this subsection shall be capped in accordance with the following trees per acre limitations: (1) in the case of grapefruit, 104 trees per acre; (2) in the case of valencias, 123 trees per acre; (3) in the case of navels, 118 trees per acre; (4) in the case of tangelos, 114 trees per acre; (5) in the case of limes, 154 trees per acre; and (6) in the case of other or mixed citrus, 104 trees per acre.

Pub.L. No. 106–387, § 810(a). The law further provides: "The Secretary of Agriculture shall use $58,000,000 of the funds of the Commodity Credit Union to carry out this section, to remain available until expended." Pub.L. No. 106–387, § 810(e).

In June, November and December of 2000, three public orders were issued by FDACS to destroy citrus trees owned by Star–Glo. FDACS subsequently removed the trees pursuant to the public orders. As a result, Star–Glo applied for tree replacement and lost production payments from the USDA pursuant to section 810. Payments to Star–Glo totaling $4,160,916.96 were made on November 6, 2000, December 15, 2000, February 15, 2001 and July 25, 2001.

In July, 2000 and March, 2001, two public orders were issued by FDACS to destroy citrus trees owned by Ruby Red. FDACS subsequently removed the trees pursuant to the public orders. As a result, Ruby Red also applied for tree replacement and lost production payments from the USDA pursuant to section 810. Payments to Ruby Red totaling $2,912,118.36 were made on November 6, 2000, April 5, 2001 and July 25, 2001.

On September 5, 2001, both plaintiffs submitted amended claims to the USDA asserting that the payments made to them were improperly calculated and asking for the balance of the compensation plaintiffs claimed they were owed. The plaintiffs alleged that the section 810 payments should have been calculated by using "grove acreage," which includes not only the acreage of the groves containing the trees destroyed, but also the unplanted acreage used to support the trees destroyed, including land for harvesting, for maintenance machinery, for staging areas, for swales and for water treatment areas. Star–Glo proposes a calculation based on 885.07 acres; Ruby Red proposes a calculation based on 593.9 acres. In contrast, the USDA calculated the payments using "net acreage" that included only acreage on which the destroyed trees were actually planted (for Star–Glo, 542.08 acres and for Ruby Red, 394.19 acres). The USDA used a consistent acreage definition, including only the acreage of groves containing trees destroyed, for all claimants, not just for Star–Glo and Ruby Red. Defendant continues to maintain that it used the correct calculation method. Under plaintiffs' acreage calculation theory, using total grove acreage, plaintiffs argue that they would be entitled to receive additional compensation because the number of compensable trees would increase with increased acreage.

On October 5, 2001, the USDA denied the claims submitted by Star–Glo and Ruby Red.

By March 2, 2002, the USDA had expended all of the $58,000,000.00 appropriated under section 810. Pub.L. No. 106–387, § 810(e). Plaintiffs did not file suit in this court until May 20, 2003. Plaintiffs claim they are owed $1,281,698.86 in monetary damages ($749,-439.60 for Star–Glo and $532,259.26 for Ruby Red) because, according to the plaintiffs, the USDA breached its payment obligation to the plaintiffs by calculating their payments pursuant to section 810 based on incorrect acreage.

## DISCUSSION

The defendant has filed a motion for summary judgment on the plaintiff's complaint pursuant to Rule 56 of the Rules of the Court of Federal Claims (RCFC). RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Telemac Cellular Corp. v. Topp Telecom, Inc.,* 247 F.3d 1316, 1323 (Fed.Cir.2001), *reh'g denied and en banc suggestion declined* (2001); *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d 1253, 1257 (Fed.Cir.2001); *Avenal v. United States,* 100 F.3d 933, 936 (Fed.Cir.1996), *reh'g denied* (1997); *Creppel v. United States,* 41 F.3d 627, 630–31 (Fed. Cir.1994). A fact is material if it will make a difference in the result of a case under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 247–48, 106 S.Ct. 2505; *see also Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d at 1257; *Curtis v. United States,* 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied,* 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959),

*reh'g denied,* 361 U.S. 941, 80 S.Ct. 375, 4 L.Ed.2d 361 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Co. v. United States,* 157 F.3d 849, 854 (Fed.Cir. 1998) (the nature of a summary judgment proceeding is such that the trial judge does not make findings of fact); *Johnson v. United States,* 49 Fed.Cl. 648, 651 (2001), *aff'd,* No. 01–5143, 2002 WL 31724971 (Fed.Cir. Dec. 3, 2002); *Becho, Inc. v. United States,* 47 Fed.Cl. 595, 599 (2000). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. 2505; *Jay v. Sec'y of Dep't of Health and Human Servs.,* 998 F.2d 979, 982 (Fed. Cir.1993), *reh'g denied and en banc suggestion declined* (1993). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Hall v. Aqua Queen Mfg., Inc.,* 93 F.3d 1548, 1553 n. 3 (Fed.Cir.1996). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Summary judgment:

> saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

*Dehne v. United States,* 23 Cl.Ct. 606, 614–15 (1991) (citing *Pure Gold, Inc. v. Syntex, Inc.,* 739 F.2d 624, 626 (Fed.Cir.1984)), *vacated on other grounds,* 970 F.2d 890 (Fed.Cir.

1992); *United States Steel Corp. v. Vasco Metals Corp.*, 55 C.C.P.A. 1141, 394 F.2d 1009, 1011 (1968).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505; *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 971 (Fed.Cir.2001), *cert. denied*, 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002); *Gen. Elec. Co. v. Nintendo Co.*, 179 F.3d 1350, 1353 (Fed.Cir. 1999). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. at 587–88, 106 S.Ct. 1348; *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d at 1257; *Wanlass v. Fedders Corp.*, 145 F.3d 1461, 1463 (Fed.Cir.1998), *reh'g denied and en banc suggestion declined* (1998).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Trilogy Communications, Inc. v. Times Fiber Communications, Inc.*, 109 F.3d 739, 741 (Fed.Cir.1997) (quoting *Conroy v. Reebok Int'l. Ltd.*, 14 F.3d 1570, 1575 (Fed.Cir.1994), *reh'g denied and en banc suggestion declined* (1995)), *reh'g denied and en banc suggestion declined* (1997); *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1569 (Fed.Cir.1997). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett*,

477 U.S. at 322, 106 S.Ct. 2548; *Am. Airlines v. United States*, 204 F.3d 1103, 1108 (Fed. Cir.2000); *see also Schoell v. Regal Marine Indus., Inc.*, 247 F.3d 1202, 1207 (Fed.Cir. 2001).

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the nonmoving party must go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.* After reviewing the parties' submissions, the court finds that there are no material facts in dispute to prevent resolving the case by means of summary judgment.

In defendant's motion for summary judgment, the government alleges that the funds appropriated in section 810, pursuant to which growers could seek compensation under the citrus canker program, had been fully expended by the USDA before the time the plaintiffs filed suit with this court. Therefore, according to the defendant, there are no funds available to pay additional claims, including those asserted by plaintiffs in this court, regardless of merit. Moreover, the agency may not transfer money from other programs unless directed by Congress, regardless of the possible merit of the claims. Plaintiffs counter that the words in section 810 did not indicate congressional intent to place a cap of $58,000,000.00 on payments under the program, but rather included a dollar figure to ensure that the Secretary spent at least that amount on the program. Therefore, plaintiffs argue that the USDA must reprogram funds in order to pay the debt claimants say they are owed. Plaintiffs also argue that at the times plaintiffs submitted their claims to the USDA for payments, sufficient funds were available to pay their claims.

The issue presented is whether the words included in Public Law No. 106–387, § 810(e), "[t]he Secretary of Agriculture shall use $58,000,000 of the funds of the Commodity Credit Corporation to carry out this sec-

tion, to remain available until expended," created an uncapped set-aside or a capped set-aside of funds for the citrus canker program. Pub.L. No. 106–387, § 810(e). If the appropriation created a capped set-aside of funds, then summary judgment must be granted in favor of the defendant because the agency cannot spend more money on the program than was authorized for spending by Congress. *See Highland Falls–Fort Montgomery Cent. Sch. Dist. v. United States,* 48 F.3d 1166, 1171, 1172 (Fed.Cir.1995) (citing 31 U.S.C. § 1341(a)(1)(A) (1988 & Supp. V 1993) and 31 U.S.C. § 1532 (1988), affirming the judgment of the Court of Federal Claims dismissing plaintiff's complaint for failure to state a claim upon which relief could be granted, because the Department of Energy had expended all funds appropriated to it for a particular program), *cert. denied,* 516 U.S. 820, 116 S.Ct. 80, 133 L.Ed.2d 38 (1995).[1] If Congress capped the fund for the program to compensate growers affected by citrus canker, then, even if plaintiffs were correct that the original payments were miscalculated, no relief is available because the defendant cannot violate the statutory $58,000,000.00 cap on available program funds. *See id.* at 1171.

The Antideficiency Act, 31 U.S.C. § 1341(a)(1)(A) (2000), states that: "An officer or employee of the United States Government ... may not—(A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation ...." In addition, 31 U.S.C. § 1532 (2000) states that: "An amount available under law may be withdrawn from one appropriation account and credited to another or to a working fund only when authorized by law." Together, these authorities provide the traditional rule that if Congress intended to cap available programmatic funds, the USDA cannot expend additional funds under this program, without specific and additional authorization from Congress.

The United States Supreme Court has held that an agency will violate the statute it is implementing if Congress has unambiguously expressed its intended meaning and the agency does not act in accord with this intent.

> When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (footnotes omitted); *accord Yellow Transp., Inc. v. Michigan,* 537 U.S. 36, 45, 123 S.Ct. 371, 154 L.Ed.2d 377 (2002) (quoting *Chevron*).

 When interpreting statutory language, the court's analysis begins with the plain language of the statute. *Duncan v. Walker,* 533 U.S. 167, 172, 121 S.Ct. 2120, 150 L.Ed.2d 251; *Carter v. United States,* 530 U.S. 255, 257, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000). In interpreting the plain meaning of the statute, it is the court's duty, if possible, to give meaning to every clause and word of the statute. *Duncan v. Walker,* 533 U.S. at 174, 121 S.Ct. 2120; *Williams v.*

---

1. Defendant in the present case filed a RCFC 56 motion for summary judgment based on the exhaustion of the section 810(e) fund. As noted above, the Court of Federal Claims in *Highland Falls* dismissed the plaintiff's claims in that case on a RCFC 12(b)(6) failure to state a claim upon which relief can be granted, based also on an exhaustion of funds. *See Highland Falls–Fort*

*Montgomery Cent. Sch. Dist. v. United States,* 48 F.3d at 1172. The difference in the disposition of this case and *Highland Falls* is that the present court is relying on documents in the record outside of the pleadings, and, therefore, is disposing of the case on the defendant's summary judgment motion. *See* RCFC 12(b)(6), 56.

*Taylor,* 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (describing as a "cardinal principle of statutory construction" the rule that every clause and word of a statute must be given effect if possible). Similarly, the court must avoid an interpretation of a clause or word which renders other provisions of the statute inconsistent, meaningless, or superfluous. *Duncan v. Walker,* 533 U.S. at 167, 121 S.Ct. 2120 (noting that courts should not treat statutory terms as "surplusage"). " '[W]hen two statutes are capable of coexistence ... it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.' " *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,* 515 U.S. 528, 533, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995) (quoting *Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974)); *see also Hanlin v. United States,* 214 F.3d 1319, 1321 (Fed.Cir.2000), *reh'g denied* (2000).

■ A court must not stray from the statutory definition of a term. *See Stenberg v. Carhart,* 530 U.S. 914, 942, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000); *Meese v. Keene,* 481 U.S. 465, 484–485, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987); *Colautti v. Franklin,* 439 U.S. 379, 392 n. 10, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979). "It is axiomatic that the statutory definition of the term excludes unstated meanings of that term." *Meese v. Keene,* 481 U.S. at 484–85, 107 S.Ct. 1862. As the United States Court of Appeals for the Federal Circuit stated in *AK Steel Corporation v. United States:*

> When Congress makes such a clear statement as to how categories are to be defined and distinguished, neither the agency nor the courts are permitted to substitute their own definition for that of Congress, regardless of how close the substitute definition may come to achieving the same result as the statutory definition, or perhaps a result that is arguably better.

*AK Steel Corp. v. United States,* 226 F.3d 1361, 1372 (Fed.Cir.2000). When a word is undefined, courts regularly give that term its ordinary meaning. *Asgrow Seed Co. v. Winterboer,* 513 U.S. 179, 187, 115 S.Ct. 788, 130 L.Ed.2d 682 (1995); *AK Steel Corp. v. United States,* 226 F.3d at 1371.

■ A single term, however, may not be read in isolation. *See Pollard v. E.I. du Pont de Nemours & Co.,* 532 U.S. 843, 852, 121 S.Ct. 1946, 150 L.Ed.2d 62 (2001) (citing *Gade v. Nat'l Solid Wastes Mgmt. Assn.,* 505 U.S. 88, 99, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992)); *see also General Dynamics Land Systems, Inc. v. Cline,* —— U.S. ——, 124 S.Ct. 1236, 1245–46, 157 L.Ed.2d 1094 (2004) (" 'Statutory language must be read in context [since] a phrase "gathers meaning from the words around it." ' " (quoting *Jones v. United States,* 527 U.S. 373, 389, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999)) (quoting *Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961))). The "meaning of a provision is 'clarified by the remainder of the statutory scheme ....' " *United States v. Cleveland Indians Baseball Co.,* 532 U.S. 200, 217, 121 S.Ct. 1433, 149 L.Ed.2d 401 (2001) (quoting *United Sav. Assn. of Tex. v. Timbers of Inwood Forest Assocs. Ltd.,* 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) and describing statutory construction as a "holistic endeavor"). "Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used." *King v. Saint Vincent's Hosp.,* 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991) (quoting *NLRB v. Federbush Co.,* 121 F.2d 954, 957 (2d Cir. 1941) (L. Hand, J.)). Even the "idiomatic sense of the statutory phrase," "the commonly understood, narrow sense" and "the natural meaning of the phrase" can be used to understand the statutory language. *General Dynamics Land Systems, Inc. v. Cline,* —— U.S. ——, 124 S.Ct. 1236, 1243–45, n. 5, 7, 157 L.Ed.2d 1094 (2004)

■ When the statute provides a clear answer, the court's analysis is at an end. *Harris Trust and Sav. Bank v. Salomon Smith Barney, Inc.,* 530 U.S. 238, 254, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000) (quoting *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999)). Thus, when the " 'statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.' " *Johnson*

*v. United States,* 529 U.S. 694, 723, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000) (quoting *United States v. Ron Pair Enterps., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917))). In such an instance, the court will not consider "conflicting agency pronouncements" or "extrinsic evidence of a contrary intent." *Weddel v. Sec'y of Dep't of Health and Human Servs.,* 23 F.3d 388, 391 (Fed. Cir.1994) (citing *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 476, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992) (noting that the court must not defer to agency interpretation contrary to intent of Congress evidenced by unambiguous language) and *Darby v. Cisneros,* 509 U.S. 137, 147, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993)). "[O]nly language that meets the constitutional requirements of bicameralism and presentment has true legal authority." *Weddel v. Sec'y of Dep't of Health and Human Servs.,* 23 F.3d at 391 (citing *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983)). " '[C]ourts have no authority to enforce [a] principl[e] gleaned solely from legislative history that has no statutory reference point.' " *Shannon v. United States,* 512 U.S. 573, 583–84, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994) (quoting *Int'l Bhd. of Elec. Workers. Local Union No. 474 v. NLRB,* 814 F.2d 697, 712 (D.C.Cir.1987)). Consequently, if a statute is plain and unequivocal on its face, there is no need to resort to the legislative history underlying the statute. *See Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 119, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001) (citing *Ratzlaf v. United States,* 510 U.S. 135, 147–148, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) ("[W]e do not resort to legislative history to cloud a statutory text that is clear.")).

■ Courts may look to "congressional clues" including "prefatory provisions." *See General Dynamics Land Systems, Inc. v. Cline,* —— U.S. ——, 124 S.Ct. 1236, 1242–44, 157 L.Ed.2d 1094 (2004). In addition, there are select instances when resort to legislative history may be permissible. For example, a court may consider legislative history if:

the plain meaning produces a result that is not just "harsh," *Griffin v. Oceanic Con-*

*tractors, Inc.,* 458 U.S. 564, 576, 102 S.Ct. 3245, 3252, 73 L.Ed.2d 973 (1982), "curious," *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 172, 98 S.Ct. 2279, 2291, 57 L.Ed.2d 117 (1978), or even "stark and troubling," *Estate of Cowart,* 505 U.S. at [483], 112 S.Ct. at 259[8], but "so bizarre that Congress 'could not have intended' it," *Demarest v. Manspeaker,* 498 U.S. 184, 186, 190–91, 111 S.Ct. 599, 601–02, 603–04, 112 L.Ed.2d 608 (1991).

*Weddel v. Sec'y of Dep't of Health and Human Servs.,* 23 F.3d at 391. Legislative history may be introduced into the analysis to resolve an ambiguous statute. *Ratzlaf v. United States,* 510 U.S. at 148 n. 18, 114 S.Ct. 655 (citing *Barnhill v. Johnson,* 503 U.S. 393, 401, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992)); *Patterson v. Shumate,* 504 U.S. 753, 761, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992). Regarding the citrus canker compensation program included in section 810 of the appropriations act at issue, no relevant legislative history has been identified.

■ For assistance in interpreting appropriations statutes, courts, including the United States Court of Appeals for the Federal Circuit, (*see, e.g., Thompson v. Cherokee Nation of Okla.,* 334 F.3d 1075, 1084 (Fed.Cir. 2003)), consult a well-recognized appropriations treatise: Office of the General Counsel, U.S. General Accounting Office, *Principles of Federal Appropriations Law* 6–4 (2d ed.1992) (report number: GAO/OGC–92–13) (hereinafter GAO Redbook). The GAO Redbook opines that when Congress designates "part of a more general lump-sum appropriation for a particular object," Congress can mean for that part to be "a maximum, a minimum, or both." *Id.* at 6–4. According to the GAO Redbook, it is generally the case that a maximum amount is the most that the agency can spend on the program. *Id.* A minimum is an amount that must be spent on the program, but may be supplanted by additional funding from a general appropriation. *See Cherokee Nation of Okla.,* 334 F.3d at 1086 (stating that "unless there is a specific 'statutory cap' on the use of lump-sum appropriations, or a specific restriction in other legislation, an agency is not restricted in its ability to reprogram" (citing the GAO Red-

book)). "[T]he most effective way to establish a maximum (but not minimum) earmark is by the words 'not to exceed' or 'not more than.' The words 'not less than' most effectively establish a minimum (but not maximum)." GAO Redbook, *supra*, at 6–8. The language denoting that funds "shall be available" "presumptively 'fences in' the earmarked sum (both maximum and minimum), but is more subject to variation based upon underlying congressional intent." *Id.* at 6–8.

There are three significant phrases in the text of section 810(e) which the parties argue speak to whether or not a specific statutory cap was established in the congressional language: "The Secretary of Agriculture *shall use* $58,000,000 *of the funds* of the Commodity Credit Corporation to carry out this section, *to remain available until expended.*" Pub.L. No. 106–387, § 810(e) (emphasis added).

The first of the phrases in section 810(e): "The Secretary of Agriculture *shall use* $58,000,000 of the funds," supports the argument that section 810 includes a legislative maximum on the set-aside of funds. Pub.L. No. 106–387, § 810(e) (emphasis added). The language "shall use" is similar to "shall be available," which, according to the GAO Redbook, denotes a minimum and a maximum set aside of funds unless Congress indicates otherwise. GAO Redbook, *supra*, at 6–8; *In re Earmarking of Funds for the United Nations Children's Fund*, 53 Comp. Gen. 695, 1974 U.S. Comp. Gen. LEXIS 206, at *3–4 (Mar. 22, 1974) ("It is a general rule of statutory construction that an appropriation for a specific object is available for that object to the exclusion of a more general appropriation and that the exhaustion of a specific appropriation does not authorize charging the excess payment to a more general appropriation"). Additionally, "shall use" in section 810(e) is similar to the phase "shall be for" which was interpreted in the *Highland Falls* case to be a maximum set-aside of funds. *Highland Falls–Fort Montgomery Cent. Sch. Dist.,* 48 F.3d at 1170. In *Highland Falls,* the United States Court of Appeals for the Federal Circuit stated that, "we have great difficulty imagining a more

direct statement of congressional intent." *Id.*

Plaintiffs, however, contend that Congress did not intend to establish a maximum because it did not specifically so state and that the set-aside of funds with the phrase "shall use" does not by itself set a maximum. Plaintiffs argue that Congress used several other phrases in the same appropriations act to denote maximums, and, by extension, section 810(e) does not establish a maximum because it would render those other phrases in the appropriations act superfluous:

> For example ... the phrase, "not to exceed $...," appears 62–times in the Appropriations Act; the phrase, "up to $...," appears 17–times in the Act; and the phrase, "not more than $...," appears 11–times in the Act. Congress clearly knew how to express its intention to impose maximums on spending when it so desired. That Congress used terms that clearly demonstrate the intent to place a cap ... in certain sections of the Appropriations Act, but not in the section devoted to citrus canker payments, demonstrates that no cap was intended in Section 810 of the Appropriations Act. Any other interpretation would render the phrases, "not to exceed," "up to," and "not more than," superfluous.

Although it is true that statutes should be interpreted so that terms are not superfluous and are consistent, here the term "shall use" has a specific purpose and meaning, as more fully understood when combined with the rest of the specific language of section 810(e), including the terms "of the funds" and "to remain available until expended." There are many terms by which Congress can set appropriation maximums. No specific term is required. Moreover, although other terms may have been chosen to denote maximums in other portions of the statute, the phrase in section 810, "shall use," is sufficient to direct that $58,000,000.00, not more, out "of the" larger appropriation for the Commodity Credit Corporation shall be used for the citrus canker compensation program.

The second significant phrase in section 810(e): "$58,000,000 *of the funds* of the Commodity Credit Corporation," further supports

the conclusion that a maximum cap was established by section 810. Pub.L. No. 106–387, § 810(e) (emphasis added). Plaintiffs, however, argue that the phrase in section 810(e): "$58,000,000 *of the* funds of the Commodity Credit Corporation," "indicates that Congress was setting aside funds from the Commodity Credit Corporation [appropriation] to ensure that *at least* $58 million was available for Citrus Canker payments" (emphasis added). Nowhere in the statute, however, is the concept or words expressing "at least" indicated. The phrase "of the funds" denotes that the funds will be coming from the larger, general appropriation for the Commodity Credit Corporation, not that no cap was set. Moreover, the use of the phrase "of the funds" does not alter the cap on funds established by the phrases "shall use" and "to remain available until expended." In fact, in support of a decision by the GAO that an earmarked amount represented a maximum, the GAO reasoned that Congress did not intend to reduce Presidentially requested amounts for other programs included in the budget request and the appropriation, given the following statutory language: "Of the funds made [sic] available to carry out this chapter for each of fiscal years 1974 and 1975, $18,000,000 shall be available in each such fiscal year only for contributions to the United Nations Children's Fund." *In re Earmarking of Funds for the United Nations Children's Fund*, 53 Comp. Gen. 695, 1974 U.S. Comp. Gen. LEXIS 206, at *4. That same reasoning is applicable here. Although Congress directed that $58,000,000.00 "of the funds" of the Commodity Credit Corporation were to be used for the citrus canker compensation program, there was no indication in the appropriation that Congress intended or anticipated that the Commodity Credit Corporation's appropriations for other purposes would be reduced further by the citrus canker program.

The third significant phrase in section 810(e), "funds … to remain available until expended," further reinforces the argument that Congress set a $58,000,000.00 cap on the citrus canker program. By virtue of the addition of the words "to remain available until expended" to the words: "The Secretary of Agriculture shall use $58,000,000 of the funds of the Commodity Credit Corporation to carry out this section," the plain meaning of the language is that once the $58,000,000.00 is paid out, the funds available for the citrus compensation program are exhausted. Pub.L. No. 106–387, § 810(e). As discussed above, plaintiff argues that the words "not to exceed," "up to" and "not more than" in other sections of the same appropriations act are words denoting a cap. The words "to remain available until expended" plainly convey the same statutory meaning and congressional intent to set a specific limitation on the funds available for the citrus canker program, namely $58,000,000.00.

The court recognizes that the language "to remain available until expended" also has been understood as a carry-over provision. "The phrase 'shall remain available' is a term of art in appropriations legislation that … [has] consistently [been] interpreted, not as a statutory cap on funding to a particular source, but as an authorization of 'carry-over authority,' indicating that unexpended funds 'shall remain available' for the same purpose during the succeeding fiscal year." *Thompson v. Cherokee Nation of Okla.*, 334 F.3d at 1090. The two concepts of carry-over and cap, however, are not inconsistent. The congressional meaning intended by the use of the words in section 810 was to establish a $58,000,000.00 fund to deal with the citrus canker program and that those funds, and only those funds, were to be dedicated to that program until exhausted.

Given the common understanding, the context and relevant case law, together with the absence of any expression of legislative definition in the statute or legislative history to the contrary, the words or whole phrases taken together are interpreted to establish a maximum amount of funds that may be spent on the citrus canker disease program under section 810(e) at $58,000,000.00. *See General Dynamics Land Systems, Inc. v. Cline*, —— U.S. ——, 124 S.Ct. 1236, 1245–47, 157 L.Ed.2d 1094 (2004). Once the established funds are used up, no further payments under the program established in section 810(e) may be made.

*Claims Made Prior to the Depletion of Funds*

Plaintiffs additionally argue that even if section 810 set a maximum expenditure of $58,000,000.00, they had a vested right to payment of their claims because they submitted their amended claims to the USDA at a time when there were still funds available.[2] Plaintiffs base their argument solely on the case of *Blackhawk Heating & Plumbing Co. v. United States*, 224 Ct.Cl. 111, 622 F.2d 539 (1980). The court in *Blackhawk* was asked to review a settlement negotiation and interpret the terms of a subsequent settlement agreement, which constituted a contract between the parties. *Id.*, 224 Ct.Cl. at 125, 622 F.2d at 546. The United States Court of Claims wrote: "The rationale of these decisions is that a contract of the United States, if valid when made, is to be governed by the same rules that apply to contracts between private parties." *Id.*, 224 Ct.Cl. at 137, 622 F.2d at 553. In *Blackhawk*, the settlement agreement provided for two payments. *Id.*, 224 Ct.Cl. at 121, 622 F.2d at 544. The first payment became due before Congress curtailed the funds available and set a statutory cap. *Id.*, 224 Ct.Cl. at 135, 622 F.2d at 552. The second became due thereafter. *Id.* In the instant case, there is no contract to enforce between the government and the plaintiffs. Rather, the plaintiffs seek to obtain additional government assistance from the monies made available to farmers affected by Florida's citrus canker eradication program pursuant to a specific statutory appropriation. Pub.L. No. 106–387, § 810(a).

Furthermore, in *Blackhawk*, the agency indicated during settlement negotiations that money to cover the agreed to terms of the settlement would be reprogrammed from other agency funds under generally available procedures. *Blackhawk Heating & Plumbing Co.*, 224 Ct.Cl. at 118, 622 F.2d at 542. In the case before this court, there is no indication in the record that funds beyond the $58,000,000.00 appropriated for the citrus program were ever held out as available to the plaintiffs or to any other citrus growers. The instant case involves an appropriation which includes a specific dollar figure to be available for the specific program involved. The theory of line-item appropriations is, therefore, analogous.

> [U]nder a specific line-item appropriation, ... [t]he contractor ... is deemed to have notice of the limits of the spending power of the government official with whom he contracts. A contract under these circumstances is valid only up to the amount of the available appropriation. Exhaustion of the appropriation will generally bar any further recovery beyond that limit.

*GAO Redbook, supra,* at 6–18. Plaintiffs, in the present case, were both paid compensation for their initial claims. Plaintiffs, therefore, were aware, or should have been aware, of the $58,000,000.00 figure included in the applicable statute. The fact that plaintiffs filed their amended claims before the appropriation was fully expended does not give them a vested right to payment.

As discussed above, when a cap exists on an appropriation and the funds have been disbursed to other recipients, funds are no longer available to the agency for that purpose. *See City of Houston v. Dep't of Hous. and Urban Dev.*, 24 F.3d 1421, 1426 (D.C.Cir. 1994); *see also* 31 U.S.C. § 1341(a)(1) (providing that a United States government employee or officer may not make an expenditure exceeding an amount available in an appropriation); 31 U.S.C. § 1532 (providing that "[a]n amount available under law may be withdrawn from one appropriation account and credited to another ... only when authorized by law.")

Some federal courts have carved out a limited, equitable exception to award plaintiffs compensation when no funds are available. *See, e.g., City of Houston v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421, 1426 (D.C.Cir.1994); *W.Va. Ass'n of Cmty. Health Ctrs. v. Heckler*, 734 F.2d 1570, 1576–77

---

**2.** As noted above, amended claims were filed at the administrative level by plaintiffs Star–Glo and Ruby Red for additional payments on September 5, 2001. On October 5, 2001, both amended claims were denied by the USDA. The

USDA acknowledges that, at the time the amended claims were filed, funds remained available for citrus canker claims. Plaintiffs, however, did not file suit in this court until May 20, 2003.

(D.C.Cir.1984). That exception appears in the case law when an appropriation's statutory date has passed without a carry-over provision, and the funds have reverted to the general treasury on the date of expiration, not when the funds have been exhausted. *See* 31 U.S.C. § 1502(a) (2000), *W.Va. Ass'n of Cmty. Health Ctrs. v. Heckler,* 734 F.2d at 1576. Moreover, in order to invoke the exception, the lawsuit must have been filed on or before the statutory lapse date, *see id.,* and an order must have been sought from the court to set aside sufficient funds to cover a potential judgment, *id.* at 1577. In *West Virginia Association of Community Health Centers,* the plaintiffs filed suit and sought a preliminary injunction before the appropriation at issue lapsed. In that case, however, the Circuit Court held that the case was moot because the preliminary injunction was denied, and, therefore, no funds remained available to compensate the plaintiffs. *Id.* Even under the reasoning of the *West Virginia Association of Community Health Centers* case, the plaintiffs in the case before the court would not prevail. Plaintiffs waited from October 5, 2002, when their amended claims were denied, to May 20, 2003 to file suit in this court. Moreover, at the time plaintiffs filed their law suit in this court there were no funds remaining in the appropriation.

## CONCLUSION

Because the section 810(e) appropriation provided by Congress for the citrus canker program has been exhausted, no relief is available to the plaintiffs. The court, therefore, need not reach the issue raised by plaintiffs as to whether or not defendant used the correct formula to calculate payments. After reviewing the parties' arguments, the court has construed the language of Public Law No. 106–387, § 810(e) (2000), and determined that the language of the statute: "shall use $58,000,000 of the funds of the Commodity Credit Corporation to carry out this section, to remain available until expended," establishes a maximum cap on the available funds for citrus canker payments from the Commodity Credit Corporation appropriation. Therefore, defendant's motion for summary judgment is **GRANT-** ED. The clerk's office shall dismiss plaintiffs' complaint and enter **JUDGMENT** for the defendant.

**IT IS SO ORDERED.**