# United States Court of Appeals for the Federal Circuit

04-5074

STAR-GLO ASSOCIATES, LP and
RUBY RED EQUITIES, LP,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

Leslie D. Alderman III, Alderman & Devorsetz, PLLC, of Washington, DC, argued for plaintiffs-appellants.

Michael N. O'Connell, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Mark A. Melnick, Assistant Director.

Appealed from: United States Court of Federal Claims

Judge Marian Blank Horn

# United States Court of Appeals for the Federal Circuit

04-5074

STAR-GLO ASSOCIATES, LP and
RUBY RED EQUITIES, LP,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

_____

DECIDED:    July 13, 2005

_____

Before NEWMAN, SCHALL, and DYK, Circuit Judges.

DYK, Circuit Judge.

Appellants Star-Glo Associates, LP ("Star-Glo") and Ruby Red Equities, LP ("Ruby Red") appeal from a judgment of the Court of Federal Claims, rejecting their claim for additional federal benefit payments for destroyed citrus groves. Star-Glo Assocs., LP v. United States, 59 Fed. Cl. 724 (2004). The Court of Federal Claims held that funding to compensate owners of destroyed groves, authorized by Public Law No. 106-387, § 810(e) (2000), was subject to a $58,000,000 statutory cap, and that, because the cap had been reached and the available funds exhausted before the suit was commenced, appellants' claim was barred. We agree that the appropriation was subject to a statutory cap, but we do not reach the exhaustion issue. We instead affirm

on the alternative ground that the statute does not entitle appellants to additional compensation.

BACKGROUND

The facts in this case are not in dispute. In 1995, the Florida Department of Agriculture and Consumer Services ("FDACS") initiated an eradication program to prevent the spread of citrus canker, a plant disease that results in unmarketable fruit. The FDACS program required the identification and removal of Florida citrus trees infected with citrus canker.

In November 1999 and June 2000 Congress appropriated federal funds to make payments to Florida citrus grove owners affected by the citrus canker eradication program. See, e.g., Consolidated Appropriations Act, Pub L. No. 106-113, App. E, tit. II, § 204, 113 Stat 1501, 1501A-293-94 (1999); Agricultural Risk Protection Act of 2000, Pub. L. No. 106-224, tit. II, sec. 203(e), 114 Stat. 358, 400. These statutes provided for payments to compensate citrus growers for trees destroyed by the state of Florida due to an outbreak of citrus canker. The United States Department of Agriculture ("USDA") published an interim rule describing the methodology for calculating payments pursuant to these appropriations. Citrus Canker; Payments for Commercial Citrus Tree Replacement, 65 Fed. Reg. 61,077 (October 16, 2000) (subsequently codified at 7 C.F.R. § 301.75-15 (2005)). The agency provided for payment at the rate of $26 per tree, and limited such payments to a maximum number of trees per acre. The number of trees per acre varied depending on the type of fruit. The per acre limitation was imposed as the productivity (and hence value) of fruit trees is inversely proportional to the number of trees planted per acre—the lower the density, the greater the productivity

04-5074                                    2

(and value). A per acre limitation thus prevents the overcompensation of growers with higher density acreage.[1] In calculating the per acre limit, USDA used data on the "varietal average number of trees per acre reported by the Florida citrus industry to the USDA's National Agricultural Statistics Service through the Florida Agriculture Statistics Service." Id. at 61,078. The Florida Agricultural Statistics Service produced data, in collaboration with the Florida citrus industry, on citrus production in the state. These data included information on citrus acreage and the total number of trees, by variety of citrus, county, and year of inventory. Florida Agricultural Statistics Service, FDACS, Commercial Citrus Inventory 2000. These published data on citrus acreage, the source of the USDA compensation amounts, limited the definition of acreage to "land which is actually planted with citrus trees" but excluded "[b]ayheads, ponds, sinkholes, drainage canals, lateral and swale ditches, roads, turn rows, and wide middles." Id. at vi. In order to secure payment under the interim regulations, the claimant was required to attach a copy of the FDACS order requiring the destruction. 65 Fed. Reg. at 61,078. Such orders listed the number of trees destroyed and the number of "acres" affected.

Against this backdrop, on October 28, 2000, Congress enacted the statute involved here, An Act Making Appropriations for Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Programs for the Fiscal Year ending Sept. 30, 2001, Pub. L. No. 106-387, 114 Stat. 1549. Section 810 of the statute appropriated funds for the Secretary of Agriculture to provide assistance to Florida citrus

---

[1] "Because output per acre is approximately the same, regardless of the number of trees per acre, capping the tree replacement payments provided for by this rule based on the average number of trees per acre for each variety will ensure that no grower receives combined payments (i.e., tree replacement and lost production) that exceed the total estimated per acre loss." 65 Fed. Reg. at 61,078.

growers whose trees were removed as a result of citrus canker control efforts. Pub. L. No. 106-387, app., tit. VIII, § 810, 114 Stat. 1549, 1549A-52-53 (hereinafter section 810). After passage of the Act, the interim regulation of the USDA concerning tree replacement was adopted as the final regulation for tree replacement payments. 7 C.F.R. § 301.75-15 (2001).

Section 810 continued the existing policy of paying tree replacement costs for destroyed citrus trees. The relevant legislative history indicated that Congress was aware of these earlier agency efforts and approved the agency's actions. See, e.g., H.R. Rep. No. 106-157, at 36 (1999) (noting previous USDA actions); H.R. Rep. No. 106-521, at 24 (2000) (noting how the Committee's original compensation figure was derived based on estimates of affected acreage and years of lost production). This Congressional awareness of past agency practice was directly reflected in the text of the statute.

Section 810(a) incorporated the pre-existing limits on tree replacement payments that had already been established by USDA, authorizing payments to "Florida commercial citrus and lime growers [of] $26 for each commercial citrus or lime tree removed to control citrus canker in order to allow for tree replacement and associated business costs" and using the same "trees per acre limitations" for such payments. Id.[2]

---

[2]    Compare section 810(a) ("Payments under this subsection shall be capped in accordance with the following trees per acre limitations: (1) in the case of grapefruit, 104 trees per acre; (2) . . . valencias, 123 trees per acre; (3) . . . navels, 118 trees per acre; (4) . . . tangelos, 114 trees per acre; (5) . . . limes, 154 trees per acre; and (6) . . . other or mixed citrus, 104 trees per acre" with 65 Fed. Reg. 61,078. The implementing regulations for section 810(a) are codified at 7 C.F.R. § 301.75-15.

The statute for the first time provided for lost production income payments, under section 810(b), which stated that "[t]he Secretary of Agriculture shall compensate Florida commercial citrus and lime growers for lost production, as determined by the Secretary of Agriculture, with respect to trees removed to control citrus canker." Id. While the lost production provision of the statute did not specify a per acre limit, the implementing regulation—not challenged on this appeal—established rates for lost production payments for each variety of citrus, and these payments were calculated using the same per acre caps provided in section 810(a). 65 Fed. Reg. 76,582, 76,584 (Dec. 7, 2000), codified at 7 C.F.R. § 301.75-16(b) (2005). The regulations governing both tree production and lost production payments also required that claimants' "completed application should be accompanied by a copy of the public order directing the destruction of the trees and its accompanying inventory." 7 C.F.R. §§ 301.75-5(c) & 301.75-16(c). The regulations explicitly referenced the fact that the inventory on the public order noted the "number and the variety of trees removed," and in the case of the regulation for lost production payments, the regulation noted that the inventory included a description of the "acreage." Id. Section 810(e) provided that the "Secretary of Agriculture shall use $58,000,000 of the funds of the Commodity Credit Corporation to carry out this section, to remain available until expended." Id.

Over the course of a ten-month period, beginning in June of 2000, FDACS issued public orders resulting in the removal of citrus trees owned by Star-Glo and Ruby-Red. Star-Glo, 59 Fed. Cl. at 726. The inventories contained in these public orders set forth the number of trees to be destroyed and the affected "acres". Thus, for

example, the November 2, 2000, order mandating the destruction of Star-Glo "Star Ruby" grapefruit trees, listed a total of 22,316 trees and 122.86 acres.

Both appellants Star-Glo and Ruby Red filed claims for benefits with USDA pursuant to section 810. Their claims, in compliance with the implementing regulations, attached the FDACS public orders. Appellants used the FDACS tree estimates and acreage calculations as specified in the destruction orders as a basis for their requested tree replacement and lost production costs. 7 C.F.R. §§ 301.75-15(c) & 301.75-16(c). Between November 2000 and July 2001, Star-Glo received payments on its claims totaling $4,160,916.96 and Ruby Red received a total of $2,912,118.36 in payments. Star-Glo, 59 Fed. Cl. at 726. USDA used the affected acreage as reported in the Florida orders, that is, the acreage actually planted with trees, in calculating the section 810 benefit payments for appellants, as it did for all other claimants. Id.

On September 5, 2001, appellants submitted amended claims to USDA asserting that they were owed more money because the payments they had already received should have been calculated using what they there called "grove acreage," rather than the standard acreage figures used by the state in the original destruction order. Grove acreage has been defined for the purpose of this litigation as acreage which "includes not only the acreage of the groves containing the trees destroyed, but also [acreage excluded from the officially reported statistics of the Florida citrus industry, i.e.,] the unplanted acreage used to support the trees destroyed, including land for harvesting, for maintenance machinery, for staging areas, for swales and for water treatment areas." Id. at 726. The appellants' claimed grove acreage was more than 1.5 times the

size of the acreage used in their original submission.[3]  Apparently, no other citrus growers besides appellants have submitted amended claims seeking payment upon a "grove acre" basis.  On October 5, 2001, the USDA denied these claims, noting its "current policy for determining compensation is based on acreage figures that are provided . . . by the State on its . . . destruction order documents [that] describe the actual acres of trees that were required to be destroyed" and that it was "difficult to see how we could be expected to pay compensation for areas that were not actually planted in citrus and from which there is no direct loss."  (J.A. at 67.)  When the claims were filed and denied, the USDA had not exhausted the $58,000,000 appropriated under section 810.  Star-Glo, 59 Fed. Cl. at 727.

More than a year later, on May 20, 2003, after the appropriated funds had been exhausted, appellants filed suit in the Court of Federal Claims, alleging that the USDA had breached its statutory and regulatory obligations by calculating their payments based on incorrect acreage and seeking $1,281,698.86 recovery ($749,439.60 for Star-Glo and $532,259.26 for Ruby Red) for tree replacement costs and $2,214,181.68 for lost production payments ($1,299,237.90 for Star-Glo and $914,943.78 for Ruby Red).  The government argued that the $58,000,000 was a statutory cap and because the funds had been fully expended by USDA before appellants filed suit, the claims should be dismissed.  In granting the government's summary judgment motion, the Court of Federal Claims first held that the statutory language of section 810(e) established a cap of $58,000,000 on the funds available for the citrus canker program, such that "[o]nce

---

[3]  Appellants' amended claims utilized "grove acreage" of 885.07 acres for Star-Glo and 593.9 acres for Ruby Red.  In filling out the forms for the amended claims, they expressly noted the affected acreage as "grove acreage."  (See, e.g., J.A. at 61.)

the established funds are used up, no further payments under the program . . . may be made." Star-Glo, 59 Fed. Cl. at 733. The court rejected appellants' argument that "even if section 810 set a maximum expenditure of $58,000,000.00, they had a vested right to payment . . . because they submitted their amended claims . . . at a time when there were still funds available." Id. at 734. The court found that no relief was available to appellants because the appropriation had been exhausted by the time suit was filed. The court did not reach the issue whether the government had calculated the payments correctly. Id. at 735.

This appeal followed. After oral argument, we instructed the parties to submit supplemental briefing on "[w]hether the Secretary of Agriculture erred in determining that Pub. L. No. 106-387 § 810 (2000), 7 C.F.R. § 301.75-15 and 7 C.F.R. § 301.75-16 should be interpreted to provide for payment to citrus growers on a net acreage basis." We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3). We review the grant of summary judgment without deference. Thompson v. Cherokee Nation of Okla., 334 F.3d 1075, 1084 (Fed. Cir. 2003) ("Cherokee I"), aff'd, Cherokee Nation of Okla. v. Leavitt, 125 S. Ct. 1172 (2005) ("Cherokee II").

## DISCUSSION

### I

We first address the holding of the Court of Federal Claims that section 810 imposed a $58,000,000 statutory cap. The statute provides that "[t]he Secretary of Agriculture shall use $58,000,000 of the funds of the Commodity Credit Corporation to carry out this section, to remain available until expended." § 810(e). If the statute imposes a cap, payments in excess of the cap would violate the Anti-deficiency Act. 31

04-5074                                    8

U.S.C. § 1341(a)(1)(A) (2000); <u>see also</u> <u>Highland Falls-Fort Montgomery Cent. Sch. Dist. v. United States</u>, 48 F.3d 1166, 1171-72 (Fed. Cir. 1995).  Appellants contend that the language does not establish a cap, arguing that, in the absence of express limiting phrases such as "not to exceed" or "not more than," there can be no statutory cap on appropriations, and pointing out that elsewhere in this appropriations legislation the phrases "not to exceed," "not more than," and "up to" are used to denote a statutory cap.  <u>See</u> <u>Star-Glo</u>, 59 Fed. Cl. at 732 (summarizing appellants' tallying of the occurrence of these phrases in Pub. L. No. 106-387).[4]

In considering the effect of appropriations language both the Supreme Court and this court have recognized that the General Accounting Office's publication, <u>Principles of Federal Appropriations Law</u> (hereinafter the "<u>GAO Redbook</u>") provides significant guidance.  <u>Cherokee II</u>, 125 S. Ct. at 1180-81; <u>Lincoln v. Vigil</u>, 508 U.S. 182, 192 (1993); <u>see also</u> <u>Cherokee I</u>, 334 F.3d at 1084 (collecting cases).  In one respect, the <u>GAO Redbook</u> supports appellants.  It states "the most effective way to establish a maximum . . . earmark is by the words 'not to exceed' or 'not more than.'" 2 <u>GAO Redbook</u> 6-8, 2d ed. (1992).  But the <u>GAO Redbook</u> also recognizes that "[t]he 'shall be available' family of earmarking language presumptively 'fences in' the earmarked sum (both maximum and minimum) but is more subject to variation based upon underlying congressional intent."  <u>Id.</u>  In other words, the "shall be available" language can establish a cap if Congress so intends.

---

[4]     The appellants also note that in subsequent legislation to provide assistance to citrus growers for lost production from trees removed, Congress used the "no more than" formulation.  <u>See</u> Consolidated Appropriations Resolution, 2003, div. N, tit. II, Pub. L. No. 108-7, § 211, 117 Stat. 11, 545 (2003).

Recently, in the Cherokee case, both our court and the Supreme Court had occasion to address similar language in the contract context. The case involved a contract between Indian tribes and the Department of the Interior which made the government's liability "subject to the availability of appropriations." The pertinent appropriations legislation stated "of the funds provided, $7,500,000 shall remain available until expended . . . for the transitional costs of initial or expanded tribal contracts." Cherokee I, 334 F.3d at 1089 (internal quotation marks omitted). Both we, and on review, the Supreme Court, held that this appropriations language did not impose a statutory cap and that there were sufficient unrestricted funds available to make the payments. Id. at 1089, 1093; Cherokee II, 125 S. Ct. at 1180. Each opinion left open the possibility that in other circumstances the language might be construed to impose a cap. In Cherokee I, we noted that there was "no indication" from the statutory context or otherwise that the "'shall remain available' language constituted anything other than a typical 'carryover' provision." 334 F.3d at 1090. In Cherokee II, the Supreme Court noted its obligation to "give this kind of statutory language its ordinary contract-related interpretation, at least in the absence of a showing that Congress meant the contrary" and that the "Government, in our view, has provided no convincing argument for a special, rather than ordinary, interpretation here." 125 S. Ct. at 1181. The Supreme Court and we both concluded that there was no legislative history pointing to an intention to impose a statutory cap. Id.; Cherokee I, 334 F.3d at 1090.[5] The

---

[5] Both we and the Supreme Court rejected the government's contention that the language contained in House Committee Reports—"funds are to be used for" (a phrase also appearing in the legislation here)—imposed a legally binding statutory cap. Cherokee I, 334 F.3d at 1090; see also Cherokee II, 125 S. Ct. at 1182.

Supreme Court emphasized particularly the fact that a contract was involved, and the need for predictability in such circumstances, in order "to provide a uniform interpretation of similar language used in comparable statutes, lest legal uncertainty undermine contractors' confidence that they will be paid, and in turn increase the cost to the Government of purchasing goods and services." Cherokee II, 125 S. Ct. at 1181. Here, by contrast, the government is not seeking to limit contractual liability, but to limit benefit payments. In this context, considerations of predictability are far less significant, and we conclude that there is greater room to rely on other indicia of Congressional intent, such as legislative history, to ascertain the congressional purpose. For example, in Highland Falls, we directly addressed similar statutory language within the context of a benefits program and found it to impose a cap. 48 F.3d at 1170-72. We agreed with the Court of Federal Claims that, in context, statutory language such as "$15,000,000 shall be for entitlements under section 2 [§ 237] of [the] Act," established an earmarked appropriation that was binding on the agency. Id. at 1170-71.

Here, the legislative history shows a clear intent to impose a statutory cap. The Conference Report, curiously not cited in either side's brief, leaves no room to doubt that Congress intended benefits available under section 810 to be capped at $58,000,000. The conference report states that the language of section 810 "directs the Secretary of Agriculture to use not more than $58,000,000 for replacement of citrus trees and for compensation for losses as a result of citrus canker." H.R. Conf. Rep. No. 106-948, at 147 (2000) (emphasis added). While the Supreme Court's Cherokee decision confirmed that it is inappropriate to rely upon legislative history to establish the existence of a statutory cap that is not contained in the text of the statute itself, see,

04-5074                    11

e.g., Cherokee II, 125 S. Ct. at 1182-83, at the same time it agreed that such legislative history can be used to resolve ambiguities in the statutory text, id. at 1179.[6] Given the context here, the statutory text is ambiguous, and the Conference Report makes clear that Congress intended to cap the total benefits available under section 810 at $58,000,000, and we read the statute as imposing a cap.

II

The question remains, however, as to the effect of the cap. Here the appellants argue that they made their amended claims on September 5, 2001, and that the available funds were not expended until March of 2002. They further argue that the date of the claim (rather than the May 2003 date their suit was filed in the Court of Federal Claims, or the March 2004 date that judgment was entered) should determine the availability of funds. No similar question was presented in Highland-Falls, where Congress had underfunded the entitlements at issue, and the relevant appropriation had already been exhausted when the claimant first sought additional funds. 48 F.3d at 1169. Nor have the parties directed our attention to any other case that has addressed this issue. We need not decide that question here, for it is clear that, in light of the fact that payments were capped under the statute, the statute provides compensation only for acreage on which trees were actually planted—i.e., on a net acreage basis.

---

[6] But see Cherokee II, 125 S. Ct. at 1183 (Scalia, J., concurring in part) (disapproving use of legislative history). See also Cherokee I, 334 F.3d at 1090 (noting that "where appropriations acts are ambiguous, legislative history can be relied upon to resolve that ambiguity").

III

The statutory language "trees per acre" is arguably ambiguous. However, as recognized in <u>Chevron</u> we must first ascertain Congress' intent, not merely from the unadorned plain language, but by using all the "traditional tools of statutory construction." <u>Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. 837, 843 n.9 (1984). That the word "acre" is facially ambiguous does not excuse us from our duty of discovering a "clear sense of congressional intent" through "the devices of judicial construction." <u>Gen. Dynamics Land Sys. v. Cline</u>, 540 U.S. 581, 600 (2004). If the context and legislative history of the statute clearly indicate the congressional purpose, we need not go to step two of <u>Chevron</u>. <u>Id.</u> at 586-91, 600; <u>Kilpatrick v. Principi,</u> 327 F.3d 1375, 1384-85 (Fed. Cir. 2003). Here, a variety of factors serves to resolve any ambiguity in the use of the term acre, and makes clear Congress's intent to compensate grove owners on the basis of acreage that was actually planted with trees.

First, industry usage in this context makes clear that the word "acre" means "land which is actually planted with citrus trees." As noted earlier, the source of industry information, Florida Agricultural Statistics Service, FDACS, <u>Commercial Citrus Inventory 2000</u> at vi, stated that "[t]he acreage shown is land which is actually planted with citrus trees. Bayheads, ponds, sinkholes, drainage canals, lateral and swale ditches, roads, turn rows, and wide middles were excluded." The term "acre," so defined, appears repeatedly and unadorned by any modifier in the Florida inventory publication. That the term acreage is understood to mean planted acreage in this particular context is manifest not only by the published data, but also by the fact that the Florida destruction orders utilized that definition in denoting "acres" affected by the orders; that the USDA

04-5074                                    13

so understood the term; that no other growers have attempted to file claims on a "grove acreage" basis; that appellants themselves first filed their claims (and received compensation) for destroyed trees based on acreage actually planted with trees; and that no citrus growers, including appellants, provided any comment during the rulemaking process suggesting that the term acre be given a different meaning than that used in the Florida statistics. This is quite plainly an instance where the statutory term is a term of art that is defined most appropriately by the preexisting industry usage. See, e.g., La. Pub. Serv. Comm'n v. F.C.C., 476 U.S. 355, 372 (1986) (defining a statutory term "in accordance with the rule of construction that technical terms of art should be interpreted by reference to the trade or industry to which they apply"); Corning Glass Works v. Brennan, 417 U.S. 188, 201-02 (1974).

Second, even if the industry terminology was less clear, we cannot ignore the fact that section 810 was enacted against a backdrop of Florida's explicit definition of the term "acre" and the USDA's implementing regulations and practice concerning this particular compensation program. This backdrop of preexisting federal benefit programs to compensate Florida citrus growers affected by citrus canker eradication programs had already established rules and norms for such compensation, including limiting compensation to acres actually planted with trees. Congress approved the agency's prior efforts, not by mere acquiescence, but by affirmatively enacting legislation that incorporated the precise per acre limits set forth in the original interim rule, thus suggesting approval of the formula that the agency had utilized. Traynor v. Turnage, 485 U.S. 535, 546 (1988); United States v. Am. Trucking Ass'ns, Inc., 310 U.S. 534, 549 (1940).

Finally, in the face of any ambiguity in the use of the term "acre" in the statute, it is also appropriate to consider the statute's purpose in determining its meaning. See Candle Corp. of Am. v. United States Int'l Trade Comm'n, 374 F.3d 1087, 1093 (Fed. Cir. 2004) (citing Holloway v. United States, 526 U.S. 1, 9 (1999) (noting that "statutory language should be interpreted consonant with 'the provisions of the whole law, and . . . its object and policy' " (quoting John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank, 510 U.S. 86, 94-95 (1993))); Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 608 (1979) ("As in all cases of statutory construction, our task is to interpret the words of these statutes in light of the purposes Congress sought to serve.")). The statute's purpose would be undermined if acres were construed to include unplanted acres. Section 810 was designed to provide compensation to citrus growers for lost trees and lost production income from those trees. In providing compensation on a "trees per acre" basis, Congress plainly contemplated that the acreage involved would have growing trees.[7] In light of the stated purpose behind the per acre caps of compensating growers for lost trees and lost production income, we conclude that Congress intended to provide compensation for productive acreage only.

Moreover, Congress imposed a $58,000,000 statutory cap on compensation and was concerned with equity among growers in allocating these limited funds (as between growers with older, less densely planted trees, and those with younger more densely planted trees). As described by the USDA in the interim rule adopted before enactment

---

[7] Section 810(a) provides that "[t]he Secretary of Agriculture shall pay Florida commercial citrus and lime growers $26 for each commercial citrus or lime tree removed to control citrus canker in order to allow for tree replacement and associated business costs. Payments under this subsection shall be capped in accordance with the following trees per acre limitations." (emphasis added).

of the statute, the per acre caps were established in order to ensure that total compensation received under the federal benefits program was equitably distributed among growers with older and younger trees, given that "output per acre is approximately the same, regardless of the number of trees per acre." 65 Fed. Reg. at 61,078. There were insufficient funds to compensate all growers on a "grove acreage" basis. The Congressional purpose would be undermined if the allocation formula were skewed to overcompensate owners of more dense groves (at the expense of other growers), by increasing the per acre cap to include unplanted land.

Appellants argue, however, that in various other federal statutes the term "planted acre" or its equivalent appears, and that Congress's failure to use the term "planted acre" here shows that the term "acre" does not mean planted acre. We disagree. The statutes on which appellants rely used the term planted acre to distinguish acres that were planted from those that were fallow. See, e.g., 7 U.S.C. §§ 1444(e)(3) & 7218(b) (2000); 7 U.S.C. § 1463(b)(2) (1988). No such distinction needed to be made in section 810 since by definition the acreage affected by citrus canker control efforts is productive acreage. Indeed, the fact that productive acreage was involved, and that trees on such acreage had been destroyed by citrus canker control efforts, was the very situation giving rise to the right to compensation.

We conclude that Congress "has directly spoken" in determining that section 810 payments should be made only for acreage actually planted with trees, and that we "must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842-43. Under that definition, the appellants are not entitled to additional compensation.

04-5074                                16

CONCLUSION

For the foregoing reasons, we conclude that the decision below should be

AFFIRMED.

COSTS

No costs.