# United States Court of Appeals for the Federal Circuit

---

**112 GENESEE STREET, LLC, ET AL.**
*Plaintiffs-Appellees*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

---

2025-1373

---

Appeal from the United States Court of Federal Claims in No. 1:23-cv-01876-RAH, Judge Richard A. Hertling.

---

Decided: February 4, 2026

---

CHARLES MCCLOUD, Williams & Connolly LLP, Washington, DC, argued for plaintiffs-appellees. Also represented by FRANK BOWMAN, EDWARD CHARLES REDDINGTON.

MARGARET JANTZEN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellant. Also represented by WILLIAM JAMES GRIMALDI, PATRICIA M. MCCARTHY, YAAKOV ROTH.

---

Before MOORE, *Chief Judge*, CHEN, *Circuit Judge*, and ANDREWS, *District Judge*.[1]

MOORE, *Chief Judge*.

Over three hundred restaurants and businesses (Plaintiffs) brought this action against the United States (Government) seeking unpaid grant applications from the Restaurant Revitalization Fund (RRF). The United States Court of Federal Claims denied the Government's motion to dismiss the complaint for lack of Tucker Act jurisdiction and failure to state a claim upon which relief may be granted. For the following reasons, we affirm.

BACKGROUND

I.    Statutory Scheme

In the wake of the COVID-19 pandemic, Congress passed the America Rescue Plan of 2021, establishing the RRF. 15 U.S.C. § 9009c. Congress required the Small Business Administration (SBA) to administer the RRF program, § 9009c(a)(1), and appropriated $28.6 billion for RRF grants "[i]n addition to amounts otherwise available," § 9009c(b)(2)(A). Eligible entities included small restaurants, bars, and similar types of dining establishments. § 9009c(a)(4). The statute directed that "[t]he Administrator *shall use* amounts in the Fund to make grants," § 9009c(b)(3) (emphasis added), and mandated that the SBA "*shall award* grants to eligible entities in the order in which the applications are received by the Administrator." § 9009c(c)(1) (emphasis added). Congress also directed that the amounts the SBA paid to recipients "*shall be equal to* the pandemic-related revenue loss of the eligible entity." § 9009c(c)(4)(B)(i) (emphasis added).

---

[1]    Honorable Richard G. Andrews, District Judge, United States District Court for the District of Delaware, sitting by designation.

The statute required that "[d]uring the covered period, an eligible entity that receives a grant under this subsection may use the grant funds for [certain allowable] expenses incurred as a direct result of, or during, the COVID-19 pandemic." § 9009c(c)(5). Examples of expenses for which grant funds could be used include payroll costs, mortgage or rent payments, utilities, supplies, food and beverage expenses, and other operational expenses. *Id.* "Covered period" was defined as the period beginning February 15, 2020 and ending December 31, 2021 or a date determined by the Administrator not later than two years after March 11, 2021. § 9009c(a)(3). The statute also established the formula for calculating grant amounts for eligible entities where "the gross receipts . . . of the eligible entity during 2020 [are] subtracted from the gross receipts of the eligible entity in 2019." § 9009c(a)(7)(A). The statute required that if an eligible entity "fails to use all grant funds or permanently ceases operations on or before the last day of the covered period, the eligible entity shall return [the unused grant funds] to the Treasury." § 9009c(c)(6).

In accordance with the statute, the covered period for RRF grants ended on March 11, 2023, triggering the requirement for entities to return unused funds. J.A. 4. Three months later, in June 2023, the Fiscal Responsibility Act, Pub. L. No. 118-5, 137 Stat. 10, became law, rescinding all unobligated RRF funds. J.A. 7.

## II.    Procedural Background

Plaintiffs submitted RRF grant applications on the first day applications were open to the public, but none received a grant before the RRF was exhausted, even though other applicants who applied after Plaintiffs received grants. J.A. 6. Plaintiffs filed a complaint in the Court of Federal Claims alleging they were entitled to receive grants under the RRF and seeking damages in the amount of the unpaid grants. J.A. 1. Plaintiffs alleged that 15

U.S.C. § 9009c(c)(1) directed the SBA "to 'award grants to eligible entities in the order in which applications [were] received by the Administrator,' but the SBA instead made payments to applicants in the order in which it processed the applications." J.A. 1. The Government moved to dismiss pursuant to Rule of the Court of Federal Claims (RCFC) 12(b)(1), which the Court of Federal Claims denied. J.A. 1–34. The court held that "[t]he Administrator . . . was required to use the RRF to make grants under section 9009c(b)(3), and to do so in the order specified by section 9009c(c)(1), an order that gave each eligible applicant an individual right to receive payment before any later applicant. Because the SBA lacked discretion under section 9009c as to whether to pay money to specific applicants who meet the requirements of the statute or as to the amounts to award a specific applicant, section 9009c can fairly be read to be money-mandating." J.A. 22.

The Court of Federal Claims *sua sponte* raised the issue of whether Plaintiffs failed to state a claim due to a possible statutory cap on the Government's liability. J.A. 27. The Government argued that 15 U.S.C. § 9009c(b)(2)(A) established a statutory cap on government liability, and Plaintiffs argued against the cap. J.A. 27–29. The court explained the SBA "cannot evade its obligations by paying the wrong entities out of the RRF and then claiming there is no money left to pay the plaintiffs, the text of the statute notwithstanding." J.A. 32. The court also explained that "[n]o funding cap exists in section 9009c to limit the [Government]'s liability for the allegedly illegal actions of the SBA," therefore concluding that Plaintiffs stated a claim upon which relief can be granted. J.A. 33. The Court of Federal Claims granted the Government's motion to certify interlocutory appeal pursuant to 28 U.S.C. § 1292(d)(2), J.A. 35–42, and the Government appeals. We have jurisdiction under 28 U.S.C. § 1292(d).

DISCUSSION

## I.    Tucker Act Jurisdiction

We review whether the Court of Federal Claims has subject matter jurisdiction de novo. *Lummi Tribe of the Lummi Rsrv., Washington v. United States*, 870 F.3d 1313, 1317 (Fed. Cir. 2017). We also review the Court of Federal Claims' statutory interpretation de novo. *Id.* The plaintiff bears the burden of establishing subject matter jurisdiction. *Id.*

"The United States is immune from suit unless it unequivocally consents." *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 322 (2020). Under the Tucker Act, the Government waives sovereign immunity for certain damages suits in the Court of Federal Claims. *Id.* The Tucker Act grants subject matter jurisdiction to the Court of Federal Claims for "claim[s] against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1).

The Tucker Act does not create "substantive rights," so plaintiffs must ground damages claims against the Government in "other sources of law" such as "statutes or contracts." *Maine*, 590 U.S. at 322 (quoting *United States v. Navajo Nation*, 556 U.S. 287, 290 (2009) (cleaned up)). A statutory claim falls within the Tucker Act's sovereign immunity waiver if it is money-mandating—i.e., if it can "fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *Id.* (quoting *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) (cleaned up)). In particular, "[i]f [the Court of Federal Claims] can provide an adequate remedy—if a money judgment will give the plaintiff essentially the remedy he seeks—then the proper forum for resolution of the dispute is . . . the Court of Federal Claims under the

Tucker Act." *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 480 F.3d 1116, 1126 (Fed. Cir. 2007). The Tucker Act's sovereign immunity waiver does not apply, however, "when the obligation-creating statute provides its own detailed remedies, or when the Administrative Procedure Act . . . provides an avenue for relief." *Maine*, 590 U.S. at 323–24. In such cases, the statute is not money-mandating, and the Court of Federal Claims must dismiss the case for lack of subject matter jurisdiction. *Greenlee County v. United States*, 487 F.3d 871, 876 (Fed. Cir. 2007).

Discerning whether a statutory provision can be "fairly interpreted" as money-mandating under the Tucker Act involves analyzing a non-exhaustive set of the statutory provision's attributes, including: (1) mandatory statutory language; (2) the nature of the remedy; and (3) whether the damages are tied to a strings-attached, Government-administered program like a grant program. *See, e.g.*, *Maine*, 590 U.S. at 324–25 (analyzing mandatory statutory language and the backwards-looking nature of the remedy sought by the plaintiffs); *Bowen v. Massachusetts*, 487 U.S. 879, 905 (1988) (holding a Medicaid grant-in-aid program non-money-mandating because the state sought "prospective relief fashioned in light of the rather complex ongoing relationship between the parties."). 15 U.S.C. § 9009c (RRF statute) falls in middle territory not clearly delineated by precedent because it includes features that point both in favor (e.g., mandatory statutory language and backwards-looking relief) and against (e.g., payment through a grant program) it being money-mandating under the Tucker Act.

## A. Mandatory Statutory Language

Mandatory statutory language is "significant" in determining whether a statute is money-mandating. *Maine*, 590 U.S. at 324. In *Maine*, the Supreme Court explained that "[s]tatutory 'shall pay' language often reflects

congressional intent 'to create both a right and a remedy' under the Tucker Act." *Id.* (quoting *Bowen,* 487 U.S. at 906, n.42 (cleaned up)). The word "shall," in particular, is "[t]he first sign that the statute imposed an obligation." *Id.* at 310. The statute at issue in *Maine* created a "Risk Corridors" program, which compensated insurers for losses incurred through participating in the Government's online health insurance exchange. *Id.* at 302. The statute included a "triple mandate" requiring that the HHS Secretary "shall establish and administer" the Risk Corridors program, "shall provide" for payment according to the statutory formula, and "shall pay" qualifying insurers, which the Supreme Court held "falls comfortably within the class of statutes that permit recovery of money damages in the Court of Federal Claims." *Id.* at 324–25; *see also Greenlee County*, 487 F.3d at 877 ("[U]se of the word 'shall' generally makes a statute money-mandating." (cleaned up)).

Plaintiffs argue that the RRF statute uses mandatory "shall use," "shall award," and "shall be equal" language analogous to the mandatory statutory language in *Maine*. Plaintiffs Br. 15–21 (discussing § 9009c(b)(3), (c)(1), (c)(4)). We agree. No functional difference exists between "shall award grants" in § 9009c(c)(1) and "shall pay" in the Risk Corridors statute from *Maine* with respect to "'creat[ing] both a right and a remedy' under the Tucker Act." *Maine*, 590 U.S. at 324–25. Notably, another pandemic relief provision, 15 U.S.C. § 9009a, uses non-mandatory "may" language, emphasizing the mandatory nature of "shall" in the RRF statute. *See* 15 U.S.C. § 9009a(b)(2)(A) ("The Administrator *may make initial grants* to eligible persons or entities" (emphasis added)). And as the Supreme Court discussed in *Maine*, when "Congress distinguishes between 'may' and 'shall,' it is generally clear that 'shall' imposes a mandatory duty." 590 U.S. at 310–11 (cleaned up). The mandatory nature of "shall" in the RRF statute therefore weighs in favor of the statute as money-mandating.

The Government argues the Court of Federal Claims erred in concluding the "shall" language in the RRF statute is like the "shall" language in the *Maine* Risk Corridors statute because it "failed to perceive the difference between the mandatory language needed for Congress to establish a benefits program and the type of mandatory language that creates a payment right and a remedy for specified members of the public." Government Br. 16. This argument is unavailing. When analyzing the mandatory nature of a statutory obligation, it is the "use of the word 'shall' [that] generally makes a statute money-mandating," and therefore the RRF statute's use of "shall" weighs in favor of it establishing a money mandate within Tucker Act jurisdiction. *Greenlee County*, 487 F.3d at 877 (cleaned up). And, as explained below, there is no *per se* rule that statutes establishing benefits programs are not money-mandating, and the grant program created by the RRF statute is not one that takes it out of Tucker Act jurisdiction.

The Government further contends that the Court of Federal Claims ignored the full wording of section 9009c(c)(1), which it characterizes as merely an "instruction to award grants in the order in which applications are received" rather than a "directly stated . . . payment mandate." Government Br. 17. That argument fails. Subsection (b) expressly provides that "[t]he Administrator shall use amounts in the Fund to make grants described in subsection (c)." 15 U.S.C. § 9009c(b)(3). Subsection (c) then reiterates the payment obligation and specifies the recipients of those payments. Read as a whole, the statutory text favors interpreting the statute as money-mandating.

## B. Nature of the Remedy

Mandatory statutory language alone is not dispositive of whether a statutory provision is money-mandating. The nature of the relief provided by the statute (i.e., retrospective versus prospective relief) can impact whether a plaintiff's claim for monetary compensation falls within Tucker

Act jurisdiction. In *Bowen*, Massachusetts sought payment from the HHS secretary under the Medicaid Act, which directed "that the Secretary 'shall pay' certain amounts for appropriate Medicaid services." 487 U.S. at 900–01 (describing § 1396b(a) of the Medicaid Act). Despite the "shall pay" language of the statute, Massachusetts' suit was "not a suit seeking money in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it is a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money." *Id.* (emphasis in original). The Supreme Court held that the Court of Federal Claims lacked jurisdiction because Massachusetts sought prospective, specific relief rather than retrospective monetary damages. *Id.* at 910. The Court explained that "[d]amages are given to the plaintiff to *substitute* for a suffered loss, whereas specific remedies are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled." *Id.* at 895 (quoting *Maryland Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1446 (D.C. Cir. 1985) (internal citation omitted) (emphasis in original)). Massachusetts therefore should have brought its claim in district court under the Administrative Procedure Act (APA). *Id.* at 882–87, 901–05. As another example of prospective relief that was not money-mandating, in *Katz v. Cisneros*, the plaintiff housing developer challenged the Department of Housing and Urban Development's (HUD) interpretation of contract rents for low-income housing projects. 16 F.3d 1204, 1206 (Fed. Cir. 1994). We held the plaintiff's claims fell outside Tucker Act jurisdiction because the developer "unmistakably ask[ed] for prospective relief" since "[a]n adjudication of the lawfulness of HUD's regulatory interpretation will have future impact on the ongoing relationship between the parties." *Id.* at 1209.

By contrast, the Risk Corridors statute in *Maine* was money-mandating, and the Court of Federal Claims possessed jurisdiction, because "it focus[ed] on compensating

insurers for past conduct" rather than "'subsidiz[ing] future state expenditures.'" *Maine*, 590 U.S. at 325 (quoting *Bowen*, 487 U.S. at 905 n.42). The Risk Corridors statute fit "securely in the first category" because "[i]t uses a backwards-looking formula to compensate insurers for losses incurred in providing healthcare coverage." *Id.*; *see Sanford Health Plan v. United States*, 969 F.3d 1370, 1381 (Fed. Cir. 2020) (concluding that a statute providing reimbursements to health insurers for cost-sharing reductions was money-mandating based on its "shall pay" language and the backwards-looking obligation "for expenses already incurred"); *Kanemoto v. Reno*, 41 F.3d 641, 645 (Fed. Cir. 1994) (holding that the grant of restitution to those of Japanese ancestry placed in internment camps during World War II under the Civil Liberties Act of 1988 to be money-mandating because unlike *Bowen*, "a 'naked money judgment' would provide Kanemoto an adequate remedy.").

Plaintiffs argue that the RRF statute is money-mandating because the statute awarded RRF grants according to a backwards-looking statutory formula compensating eligible entities for pandemic-related losses. Plaintiffs Br. 28–41. According to Plaintiffs, the RRF statute is like the money-mandating Risk Corridors statute at issue in *Maine* as it "focus[es] on compensating" recipients "for past conduct" rather than "subsidiz[ing] future state expenditures." Plaintiffs Br. 29 (citing 590 U.S. at 325 (cleaned up)). We agree. The RRF statute, which Congress passed in 2021, established a formula for calculating "pandemic-related revenue loss" as "the gross receipts . . . of the eligible entity during 2020 subtracted from the gross receipts of the eligible entity in 2019." § 9009c(a)(7). The backwards-looking nature of the statute confirms that, like the insurers in *Maine*, "[Plaintiffs] do not ask for prospective, non-monetary relief to clarify future obligations; they seek specific sums already calculated, past due, and designed to compensate for completed labors." 590 U.S. at 327.

Relying on *Katz*, the Government argues that "regardless of the characterization of the case by [P]laintiffs [as a claim for retrospective relief], [we] must 'look to the true nature of the action in determining the existence or not of jurisdiction." Government Br. 44–45 (quoting 16 F.3d at 1207). The Government argues that "[P]laintiffs' legal theory is necessarily 'forward-looking' and invokes equitable relief" because "the source of [P]laintiffs['] alleged injury is the method SBA employed to award grants." Reply Br. 9. The Government also admits, however, that "how the agency would calculate the amount of a grant award" is "backward[s]-looking." Reply Br. 16. It is this backwards-looking nature of the grant awards that distinguishes this case from *Katz*, where the plaintiff sought "prospective relief" that would "have future impact on the ongoing relationship between the parties." 16 F.3d at 1209. The situation here where Plaintiffs seek retrospective "money in *compensation* for the damage sustained" by the government-ordered shutdowns during the COVID-19 pandemic is similarly distinguishable from *Bowen* where Massachusetts sought payment for Medicaid services as prospective, specific relief. 487 U.S. at 900–01 (emphasis in original).

Moreover, the RRF statute defined the "covered period" as the period "beginning February 15, 2020" and "ending on December 31, 2021, or a date to be determined by the Administrator that is not later than 2 years after March 11, 2021" during which an eligible entity "may use the grant funds for [certain enumerated] expenses incurred as a direct result of, or during the COVID-19 pandemic." § 9009c(a)(3), (c)(5). That the covered period began on February 15, 2020, before the RRF program's existence, shows Congress contemplated the statutory remedy as retrospective relief for "expenses already incurred" by eligible entities. *Sanford Health*, 969 F.3d at 1381. The backwards-looking nature of the statutory remedy therefore weighs in favor of the RRF statute being money-mandating within Tucker Act jurisdiction.

### C. Grant Programs

Statutes that award monetary benefits through grant programs establishing strings-attached funding requirements or requiring ongoing Government relationships in administration of the grant programs may not be money-mandating.  For example, in *Bowen*, the Medicaid statute at issue established a grant-in-aid program with a "rather complex ongoing relationship between the parties" such that the relief Massachusetts sought was prospective, specific relief "requir[ing] the Secretary to modify future practices" rather than a naked money judgment.  *Bowen*, 487 U.S. at 905.  In *Lummi*, Indian tribes sought monetary relief at the Court of Federal Claims under the Native American Housing Assistance and Self-Determination Act of 1996 (NAHASDA), which created a grant program providing direct funding to Indian tribes to provide affordable housing to tribe members.  870 F.3d at 1315.  The statute required that the "[HUD] Secretary 'shall . . . make grants' and 'shall allocate any amounts' among Indian tribes that comply with certain requirements" according to a formula based on the number of low-income housing units and amount of economic distress within a tribal area.  *Id.* at 1315–16 (quoting 25 U.S.C. §§ 4111, 4151).  We held the statute was not money-mandating because "the underlying claim is not for presently due money damages.  It is for larger strings-attached NAHASDA grants—including subsequent supervision and adjustment—and, hence, for equitable relief."  *Id.* at 1319.

Further, in *National Center For Manufacturing Sciences v. United States*, a non-profit research and development consortium, NCMS, sought distribution of funds under a cooperative research agreement with the Air Force established by the Defense Appropriations Act of 1994 (Appropriations Act).  114 F.3d 196, 197–98 (Fed. Cir. 1997).  Comparing the facts to those in *Bowen*, we concluded the Appropriations Act was not money-mandating because "[l]ike the grant-in-aid applicants referred to in *Bowen v.*

*Massachusetts*, NCMS is seeking funds to which it claims it is entitled under a statute; it is not seeking money in compensation for losses that it has suffered or will suffer as a result of the withholding of those funds." *Id.* at 200. Moreover, the Cooperative Agreement established by the Appropriations Act "contemplates a cooperative, ongoing relationship between NCMS and the Air Force in the allocation and use of the funds" so NCMS "would not be entitled to a monetary judgment that would allow it to use the funds appropriated under the Act for any purpose, without restriction." *Id.* at 201. We therefore concluded that "a simple money judgment issued by the Court of Federal Claims would not be an appropriate remedy." *Id.*

The Government asserts that the RRF statute is not money-mandating because it establishes a grant program, which is like the statutes in *Lummi* and *National Center* that established non-money-mandating, strings-attached grant programs. Government Br. 30–34. The Government argues that our logic in *Lummi* is applicable to the situation here because "[Plaintiffs'] only alleged harm is that they did not receive RRF grants because SBA arbitrarily and capriciously misallocated the funding to other entities who applied later in time." Government Br. 31. The Government also asserts that, like in *Lummi*, where the plaintiffs relied on mandatory statutory language and lack of discretion in awarding grants, "Plaintiffs[] do not make a claim for presently due money-damages, but to obtain compensation for not receiving a strings-attached grant." Government Br. 32. The Government also argues the facts here are like those in *National Center* because a simple money judgment "would allow [P]laintiffs[] to avoid the strings-attached nature of the RRF program and its requirement to use or give back the funds by the end of the 'covered period'" when the RRF statute "does not entitle [P]laintiffs[] to receive a payment . . . for any purpose, without restriction." Government Br. 33–34. The Government similarly analogizes Plaintiffs' claim to that in

*Bowen*, arguing it "is dissimilar to a genuine Tucker Act claim" because "[Plaintiffs] seek to obtain money by having a court enforce the statutory mandate for SBA to award grants in the order that applications were received." Government Br. 43.

We agree with the Government that the RRF statute's establishment of a grant program weighs against it being money-mandating. We do not hold, however, that there is a *per se* rule that grant programs or programs providing benefits in the absence of government-caused harm are not money-mandating. In *Star-Glo*, the Court of Federal Claims possessed jurisdiction over the plaintiffs' claims that they were entitled to federal funds in the absence of any government-caused harm where Congress had appropriated funds to pay Florida citrus grove owners whose crops had been affected by citrus canker. *Star-Glo Assocs., LP v. United States*, 414 F.3d 1349, 1351, 1353 (Fed. Cir. 2005). Rather, we must look to the nature of the grant program when analyzing whether a statutory provision is money-mandating, which includes assessing the nature of the strings attached to the grant funding and the relationship between the Government and grantee carrying out the grant. *See Bowen*, 487 U.S. at 905 ("We are not willing to assume, categorically, that a naked money judgment against the United States will always be an adequate substitute for prospective relief fashioned in light of the rather complex ongoing relationship between the parties."); *Lummi*, 870 F.3d at 1318–19 (explaining that the Plaintiffs Tribes' claims for a "nominally greater strings-attached disbursement" fell outside Tucker Act jurisdiction because "the disbursement of funds [was] so thoroughly scrutinized" based on NAHASDA's requirement that grant funds be used to purchase property that must be "held in trust" by the Tribes); *National Center*, 114 F.3d at 201 ("The [Appropriations] Act thus contemplates a cooperative, ongoing relationship between NCMS and the Air Force in the allocation and use of the funds[,]" and "[t]he Cooperative

Agreement reflects this ongoing relationship[,]" "in which the government is to be 'an active participant' . . . .").

The nature of the grant program here is unlike those in *Bowen, Lummi,* and *National Center.* The RRF statute required that grant funds be used for certain types of business expenses during the covered period or be returned. § 9009c(a)(3) (defining "covered period"), (c)(6) (requiring that unused grant funds be returned to the Treasury), (c)(5) (enumerating allowable uses for grant funds). The Government argues that "[a]llowing [P]laintiffs[] to receive money damages equal to the amounts sought in their unpaid grant applications would allow [P]laintiffs[] to avoid the strings-attached nature of the RRF program and its requirement to use or give back the funds by the end of the 'covered period.'" Government Br. 33 (cleaned up). None of these restrictions on the use of grant money in the RRF statute, however, requires ordering the Government to take action under the statute to maintain a complex, statutorily created relationship between the Government and the grantee. Moreover, like the Risk Corridors statute in *Maine,* "because the [RRF grant] program expired years ago, this litigation presents no special concern about managing a complex ongoing relationship or tracking ever-changing accounting sheets. [Plaintiffs'] suit thus lies in the Tucker Act's heartland." 590 U.S. at 327. The grant program established by the RRF statute ended on March 11, 2023 with the expiration of the covered period, and Plaintiffs alleged that they incurred allowable expenses during the covered period that they paid out of pocket when the SBA failed to properly award them RRF grants. J.A. 83. In contrast to other grant cases where injunctive relief was the only form of meaningful relief, Plaintiffs here can obtain "an adequate remedy" through a claim for money damages at the Court of Federal Claims. *Suburban Mortgage,* 430 F.3d at 1125.

Weighing all of these attributes, we conclude that the RRF statute can be "fairly interpreted" as money-

mandating. The mandatory "shall award" statutory language and backwards-looking nature of the damages calculation weigh in favor of the RRF statute being money-mandating. And while the statute established a grant program, the strings attached to the grant program that has already expired do not weigh heavily enough against being money-mandating to take the RRF statute out of Tucker Act jurisdiction. For these reasons, we hold the RRF statute is money-mandating.

## II   Statutory Limit on Liability

We review the Court of Federal Claims' denial of a motion to dismiss for failure to state a claim de novo. *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1364 (Fed. Cir. 2021).

Once the Court of Federal Claims concludes it has subject matter jurisdiction based on a money-mandating statute, it must determine whether Plaintiffs have established they are entitled to relief under that statute. *Greenlee County*, 487 F.3d at 876–77. Congress can create statutory obligations on the Government that mature into legal liabilities. *Maine*, 590 U.S. at 310. And when Congress creates a statutory payment obligation on the Government, lack of available funds for the money-mandating program does not necessarily cancel its obligation. The Supreme Court in *Maine* explained that agencies can incur an obligation to pay regardless of whether Congress appropriates the funds necessary to pay for that obligation. *Id.* at 308–09. In that case, the Court rejected the Government's argument that its liability under the Risk Corridors program was limited to amounts collected from profitable insurance plans because "an appropriation *per se* merely imposes limitations upon the Government's own agents, but its insufficiency does not pay the Government's debts, nor cancel its obligations." *Id.* at 312 (cleaned up).

Statutory language may limit the Government's liability to the amount appropriated by Congress, but "the mere

failure of Congress to appropriate funds, without further words modifying or repealing, expressly or by clear implication, the substantive law, does not in and of itself defeat a Government obligation created by statute." *Greenlee County*, 487 F.3d at 877–78 (quoting *N.Y. Airways, Inc. v. United States*, 369 F.2d 743, 748 (Ct. Cl. 1966) (internal quotations omitted)). Congress has commonly used the phrase "subject to the availability of appropriations" to restrict government liability to appropriated funds. *Greenlee County*, 487 F.3d at 878. Other statutory language can also be liability-limiting. In *Greenlee County*, the Payment in Lieu of Taxes Act (PILT) compensated local governments for loss of tax revenue due to the tax-immune status of federal lands located in their jurisdictions and directed that "[a]mounts are available only as provided in appropriation laws." *Id.* at 873–74. We concluded based on this statutory language that Congress intended to limit the Government's liability to amounts Congress appropriated. *Id.* at 878; *see Prairie Cnty., Montana v. United States*, 782 F.3d 685, 691 (Fed. Cir. 2015) (similarly affirming dismissal of plaintiffs' claims due to PILT's liability cap). *Star-Glo* also addressed a statute with liability-limiting language, where we held that a statute directing the Secretary of Agriculture to compensate farmers for citrus trees lost due to canker with "$58,000,000 of the funds of the Commodity Credit Corporation . . . to remain available until expended," Pub. L. No. 106-387 § 810(e) (2000), capped the Government's liability at $58,000,000. 414 F.3d at 1352. We concluded that Congress meant to cap the Government's liability at "*not more than* $58,000,000." *Star-Glo*, 414 F.3d at 1355 (emphasis in original).

The Government argues that Plaintiffs cannot state a claim upon which relief can be granted because "[a]ny obligation or liability under the RRF program was capped at $28.6 billion. This money has already been expended and Congress has demonstrated its intent that no further money should be spent by defunding the RRF program."

Government Br. 48. Plaintiffs, on the other hand, argue that "[h]ad the [SBA] followed the statute and properly recorded obligations in the order applications were received, funds for Plaintiffs' awards would have been reserved *within* the fixed appropriation." Plaintiffs Br. 63. Plaintiffs have the better argument. The Government's obligation to pay Plaintiffs attached when their applications were received, § 9009c(c)(1), and even the Government does not argue that funds would not have been available to award Plaintiffs grants if the SBA had disbursed funds properly. Plaintiffs are correct that SBA's "unlawful failure to award grants to Plaintiffs required them to cover allowable expenses out of their own pockets rather than with the grant funds they should have received." Plaintiffs Br. 67. The RRF statute therefore created an obligation for the Government to pay Plaintiffs when SBA received Plaintiffs' grant applications.

The Government also argues that the statutory language "[i]n addition to amounts otherwise available" together with a specific dollar amount, "$28.6 billion," "creates a clear limit on the amount to be expended." Government Br. 48 (citing § 9009c(b)(2)(A)). We do not agree that 15 U.S.C. § 9009c(b)(2)(A) clearly limits the Government's liability. "In addition to amounts otherwise available" is ambiguous. We agree with the trial court that this language is "more ambiguous" than the statutory text at issue in cases like *Star-Glo* and *Greenlee County*. J.A. 31; *see Greenlee County*, 487 F.3d at 874 (statute directing that "[a]mounts are available only as provided in appropriation laws."); *Star-Glo*, 414 F.3d at 1352 (statute compensating farmers with "$58,000,000 . . . to remain available until expended"). We also do not agree with the Government that "in addition to amounts otherwise available" is like other examples of liability-limiting language cited in *Maine*. Government Br. 49 (citing 590 U.S. at 313 n.7). None of the examples cited in *Maine* or any other case the Government relies on uses the same language as in 15

U.S.C. § 9009c(b)(2)(A) and cannot be used to manufacture a liability cap when there is none.

We therefore conclude that Plaintiffs have stated a claim upon which relief may be granted because they plausibly allege their grant applications were received before the SBA expended the RRF funds, creating a Government obligation to pay, and the statute's ambiguous appropriations language does not defeat this obligation.

## CONCLUSION

We have considered the Government's remaining arguments and find them unpersuasive. We affirm the decision of the Court of Federal Claims denying the Government's motion to dismiss because Plaintiffs have stated a claim within the Tucker Act's jurisdiction.

## AFFIRMED

## COSTS

Costs to appellees.